Gordon Widenhouse, we're pleased to hear from you. I'm Gordon Widenhouse, along with Christopher Adams, who represent the appellants in this case, which arises from convictions and sentences in the Western District of North Carolina for undercover sting operation involving stolen cigarettes. I'd like to confine my argument, with the Court's permission, to Issues 4 and 5 in our brief, which deal with two sentencing issues that we think are particularly important in this case. Issue 4 deals with an enhancement for loss amount in the case, and essentially the dispute was whether to use the retail value of the stolen cigarettes or the wholesale value. We think that it's important in looking at this issue for the Court to keep in mind the language that this Court used in United States v. Root, where it talked about sentencing guidelines are not designed to be mean-spirited or to seek the longest sentence possible, but are designed to look for a fair and reasonable sentence based upon the conduct in the particular case. And here what we have was, even though there's no actual theft from an entity, it was a sting operation, it was a sting that was essentially operating on the wholesale market. And the government had purchased cigarettes from the manufacturer, and the defendants then bought those cigarettes. The guidelines don't actually stipulate an amount of loss in this situation. In the absence of a stipulation, wouldn't this be a, might this not be a factual matter for the District Court to resolve? I don't think it's a factual matter, Your Honor, because the guidelines do talk about you're supposed to measure the loss based on the loss to the victim. Now, the guidelines don't say wholesale v. retail, but the commentary to the guidelines says you look to the loss to the victim in the case. And it's a very fact-specific inquiry. Once you make a determination... If there's no victim, why wouldn't the District Court have some discretion in what he found was the intended loss? Because the guidelines say that you find the loss based on a loss to the victim, and the way the District Court should approach the issue when there is no actual victim is look to what the intention would have been, which was theft on the wholesale market. Well, I'm not sure that is necessarily so. I mean, because the guidelines use the expression intended loss, and the market doesn't simply magically cut off at the wholesale level. Wholesale goods are conveyed and transported in turn to retailers. The retailers are the ones at the end of the line. And what you ultimately would almost inevitably intend, if there's no specific victim, what you would be intending ultimately is to deprive the people at the end of the line of what was the retail value of the cigarette. I disagree, Your Honor. But it's because I think the intention is the intended victim, if there was an actual victim, would be the manufacturer here. There isn't a victim here. And the ultimate loser from the operation are the retailers who won't be able to sell the cigarettes at the retail value. At least it seems to me that it's not an error for the District Court. What we always have in these appeals is an attempt to make everything into a matter of law and to recalibrate the relationship between appellate courts and district courts. I'm inclined to think that district courts enjoy a fairly wide latitude in sentencing. And unless something is wrong, the use of that word intended loss doesn't seem to me to be really wrong to think that the ultimate loser here are going to be retail establishments who would be deprived of the opportunity to sell their cigarettes at a retail value. There is not one shred of evidence in this case that a single retailer was deprived of the opportunity to sell one pack of cigarettes. But you put your finger on the problem. We're all speculating here. The pecuniary harm that was intended to result and the intended victim is somewhat speculative. You could say that it was the manufacturer, but you could also argue that it would ultimately have been the retail distributor who would have received the goods in the ordinary course. I'm having a little trouble with this as well. Who would be, in your view, the intended victim? The intended victim is the manufacturer of the cigarettes. And why do we have to stop there would be my next question. Because that's where the theft is. The theft is from someone operating on the wholesale market. That seems to me to artificially segment a stream of commerce. I mean, commerce is a continuing thing, and it proceeds in a continuing stream, and it goes from the manufacturer to the wholesaler and from the wholesaler on to the retailer to give a very simplistic view of it. But in the case where the guidelines, I'm really reluctant to make a matter a question of law where the guidelines don't make it a question of law. If the guidelines don't make it a question of law, why doesn't the position of the district court in the sentencing process make it factual or at least give the district court leeway to see the problem in a certain way? And here he sees the problem as a continuing stream of commerce. He didn't seem to have it in for you. He gave you a substantial downward variance with respect to both defendants. But I just am troubled by the kind of precedent that this would set because there are a lot of sting operations that deal with what we might regard as more serious forms of contraband than cigarettes. And we're really handcuffing a district court in dealing with major drug operations that would have to have some necessarily, some reduced value of loss. Well, but that would only be true if you had a drug case where there was a wholesale market for the drugs. And with drugs, you're generally talking about illegal activity. So there wouldn't be a wholesale market to start with if I follow. Mr. Weidenhoff, your argument causes confusion by talking about a market. The crime here is receiving stolen property. And the government portended to be selling property stolen from Philip Morris. And the loss to Philip Morris would be, your argument is, the loss to Philip Morris is the loss of transactions that Philip Morris would have been able to make. It's not a market at all. And whatever Philip Morris sells it to, the retailer, your argument is that that is the loss because the victim is Philip Morris and it's receiving stolen property. It's basically evaluating something that's stolen. Correct. And Philip Morris doesn't have any connection with a retail market. It sells a cigarette at a price to the retailers, and that's what its loss is. It can't be any more. That's your argument, isn't it? That's correct. Well, I would stay away from talking about markets and cutting off markets and retail and wholesale markets. It's a receiving stolen property case. That's correct. And the stolen property would be the equivalent of having taken it from Philip Morris. Well, that's what they said. That's what the undercover agents said. They said this property was stolen from Philip Morris from their trucks. And that's the wholesale value. And these guys took that property, and the question is what's the market value of that property? And the market value is what Philip Morris could have sold it for. Correct, which would be wholesale value. Philip Morris would have sold it at wholesale prices to distributors. That is my argument, and I think that's what the district court should have done. It's clearly preserved. I think it is consistent with the commentary of the guidelines that you try to identify the applicable victim, which here would be Philip Morris, and it would be Philip Morris' loss, which is the wholesale value of the cigarettes. That's precisely what we're arguing. That's a more straightforward argument than you were making, I think. Which is why you're up there and I'm down here, I suppose. So that is our argument, and we think that the matter should be remanded for recalculation of the sentence based on a wholesale value of the cigarettes as opposed to retail value. The other argument that I wanted to mention briefly is that that isn't quite the way it should be done. The question is what was the loss to Philip Morris? And whether you label it what kind of price it is, it was stolen from Philip Morris, they received stolen property, and they deprived Philip Morris of the ability to sell those cigarettes. Correct. The loss to Philip Morris is whatever the cigarettes were of value to Philip Morris. Correct. Which would have been the wholesale value of the cigarettes. That's fair enough. That's our argument, and I think it's consistent with Roe, and I think it's consistent with the commentary to the guidelines. Okay. Since we all seem to be so happy at the moment, I hate to disturb it, but it involves determining the initial determination as to who appears to be the victim here, and the entity victimized is the wholesale, and that's what drives the analysis. That's correct. So the starting point is the determination under the scenario of who is the victim, and that determines whether it's wholesale or retail value. Correct. And that's what Application Note 2 to the guidelines says, look to the victim. Why does there have to be a victim in a sting operation? Because the guidelines are supposed to look for the most reasonable calculation of loss on the facts of the case. And there is no victim here, so the amount of loss you could say would be zero, but that's unfair. There's an intended victim. Correct. And the intended victim is Philip Morris. The undercover agents assumed that they had represented that they had intercepted the cigarettes from Philip Morris. Correct. Correct. Stolen it from the trucks. Correct. Philip Morris, these guys understood that that was the victim. That's the intended loss. Correct. And whether it's wholesale, retail, or middletail, I mean it seems to me that whatever the evidence shows, the value of a loss to Philip Morris would be the loss calculation. Correct. That's the only victim in this case. I agree, and that's not what the district court did here. So we would ask the court to vacate. The cigarettes were eventually going to reach the hands of retailers, were they not? Certainly. They did reach the retailers. Certainly. But again. Taxes collected, but yeah. Certainly. But again, the intended victim under the guidelines is the manufacturer. So that's where the loss calculation ought to be, according to the application notes of the guidelines. I mean, maybe so, maybe not. The cigarettes are going to eventually end up in the hands of retailers. That's why Philip Morris manufactures them. He doesn't manufacture them just to have them float on water. I don't disagree with that. But that would, to take that analysis with all due respect, would belie the guidelines saying you look to the intended victim. Well, to look at an intended victim, I suppose, you'd have to look at the crime charge. And the crime charge wasn't theft from anybody, wholesalers, retailers, manufacturers. The crime was receiving stolen property from Philip Morris. Correct. So stolen property comes from Philip Morris. That's where the loss is. It's Philip Morris's loss. I really think this is a fairly simple, straightforward issue. At least I thought it was until I stood up here. But that's my point. I think the intended victim is what the guidelines tell us to look at. It seems like you got yourself into all these markets and wholesale markets and retail markets and this type of thing, which this is not a market crime. This is not an antitrust case where the competition has been hurt. This is a stolen property case, a stolen motor vehicle. If I steal a motor vehicle from someone or the government says this came from, the value of the motor vehicle to that person is the victim. And if you steal the motor vehicle from GM, it's one price. If you steal it from a Chevrolet dealership, it's a different price. You're arguing that the victim was the wholesaler. Now you've switched completely. I have not switched completely, with all due respect. My argument has been, at least I tried to make it from the beginning, if this was not a sting operation, the victim is Philip Morris. Philip Morris sells at wholesale to distributors and retailers. The lost Philip Morris is the wholesale value of the cigarettes. I thought your argument was that the wholesaler was the victim. Yes. The wholesaler is the victim. There's no evidence to support that. The evidence in the case was the intended structure of the deal, was the undercover agent said, we have stolen these cigarettes from Philip Morris, the manufacturer. Correct. And we're ready to sell them. Correct. And these people received that stolen property. They represented this as stolen property. That's the crime, receiving stolen property. The victim of receiving stolen property is the manufacturer. Correct. What are you talking about? Wholesalers and distributors and stuff. Because if I look to, because I would think the follow-up question is, so what is the loss to Philip Morris? Sure. Philip Morris sells for wholesale. They don't retail. It doesn't matter what you characterize. If Philip Morris sells at an X rate, Correct. you can find out what the loss to Philip Morris is. It's an ascertainable number. Absolutely. But it doesn't matter what rate they charge. I mean, they could charge a special rate for cooperative sales. Where in your brief does it identify Philip Morris as the victim? It's in the statement of facts where. I mean, as an argument. Well, I suppose only if you assume my assumption that they're the wholesaler. That's not the argument that you made in your brief. Why isn't that argument waived? Because I did not see in your brief an argument that Philip Morris was the victim. I saw in your brief an argument that the wholesaler was the victim. Well, you were making the assumption, in fairness, I think, that given Philip Morris' status that a wholesale rate would be applicable. Correct. And that was the argument at sentencing. And I'd say I'm out of time, so I'll rest on the brief on the other issues and save a little time for rebuttal. Thank you. May it please the Court. Michael Savage for the United States. Your Honor, Judge Whitney in the trial court below determined the procedurally unreasonable sentence based on the facts he had before him. And in echoing some of the argument before, there are, in this intended loss, which is a sting operation, there were facts presented at the trial court and in sentencing, and indeed in the sentence and pre-sentence reports, that this was more than just a fraud intended against Philip Morris. It was certainly more than simply robbing trucks. As alleged in the indictment, it was not just ITM. Your Honor, can I ask you, was there any other crime charged other than receiving stolen property or conspiracy to receive stolen property? Yes, Your Honor, interstate transportation of stolen goods. So as part of this, and one of the witnesses for the government in the case was man by man. And that's because it was stolen from trucks purportedly carrying Philip Morris' owned cigarettes. Yes, Your Honor. Is that what the structure of the crime, the sting, was presented to these defendants? The structure of the crime and the way that the crime developed, especially as alleged in the second superseding indictment, was that the trucks would be interdicted in various states, but they would interfere with the stream of commerce in interstate commerce. No, I know, but the crime is receiving stolen property, and the victim of stolen property crime is the owner of the property. The loss sustained by the victim in this case would be Philip Morris or Philip Morris' interests. I have trouble, I have a lot of difficulty in understanding how there was any loss to a retailer in this case as a victim. The retailer wasn't a victim, was it? Yes, Your Honor, I believe that they were. How is the retailer the victim of receiving stolen property? Because unlike any other type of stolen property, cigarettes are a highly regulated environment. And this highly regulated environment, as the testimony will show at trial and as developed in the sentencing hearings, the cigarettes, unlike any other product, are regulated from the very beginning to the very end. They have marketing agreements. Please let him finish his argument. Thank you, Judge. With all respect, the testimony was that they're regulated at every individual part of the transportation. From the time they go to the factory, to a bonded warehouse, where the taxes are applied, federal taxes and excise taxes are applied. They go to the wholesaler where state and local taxes are applied. Then they go to the retailer. And there were testimony from this, from both the perpetrators of the crime and the people who were working for Philip Morris, that at the time that each of these cigarettes is sold, you take any one cigarette out of the stream of commerce, and you're taking cigarettes from retailers who could sell them legitimately against those who weren't. And indeed, in the pre-sentence report, particularly if the court would look at paragraph 9, it lays this out in very specific terms to this particular case, as does the superseding indictment. And the court explains how these defendants operated various stores, including retail stores, and they involved retailers in the crime themselves. The retailers who were illegally buying these goods were fronting the money so that these people could steal the goods off of trucks in the interstate commerce. And the losses pertain not just to Philip Morris, but also to wholesalers who might legitimately sell them. They didn't have any dealings with Philip Morris. They interdicted the trucks, and they brought retailers into the scheme. Yes, Your Honor. Because the retailers understood that they had a stake in it. Yes, Your Honor. That's why they were willing to be complicit in the scheme. Yes, Your Honor. Because the retailers had a financial stake in it. Exactly. And, in fact, on the day that the defendants were arrested at Mr. Acasa's house, there was $1.3 million in a box found in his garage. That $1.3 million came from a man by the name of Syed Ahmed, who operated a string of retail stores throughout South Carolina. He fronted the money in order for them to buy the last load of cigarettes, and that $1.3 million came from a retail store. And in the testimony that was at trial, and these are also shown in the pre-sentence reports and are summarized elsewhere in the record, but the most convenient place you would find in the pre-sentence reports for both Mr. Acasa and Al Acasa, explain how these different retailers interacted with the defendants in this case and interdicted the stream of commerce that began in a very highly- The retailers were bound up in the whole thing. They were conspirators, and they're alleged as conspirators on the indictment. In the very first paragraph, the introduction of the indictment, which is at page 233 of the joint appendix. Did the wholesalers and truckers, did they end up holding the bag for some portion of the loss? Well, the truckers, it was a fiction, Your Honor, in the sense that it was a sting. So the truckers were something that the government agents introduced. And part of the case was not just the interstate transportation. It was how these defendants could come up with millions and millions of dollars on a moment's notice. And the reason the investigation went as long as it did is it took that long to ferret out where the money was coming from. And at the end of the investigation, the government discovered that the money was coming from the very retailers who were benefiting and who were- But the way it operates, the way commerce operates, is that each leg of the journey realizes a profit. That's what makes the economy work, is that the manufacturers realize a profit from the manufacturer. The wholesalers and transporters realize a profit from warehousing the goods, and they realize a profit from transporting the goods. The retailers realize a profit from selling the goods. And it's not amiss for the district court in a conspiracy in which retailers are integrally involved because they realize that they have a financial stake as well as manufacturers and wholesalers and warehouses and transporters to be co-conspirators in this. And to say, you know, it is a totally artificial view of commerce to say that there's only one victim and that victim has to be Philip Morris as if the other actors don't realize a substantial financial profit. Please. Yes, Judge. How do you reconcile that position with Rue, which tells us that the general rule is that loss is determined by measuring harm to the victim? First of all, Your Honor, I'm looking at Rue, and that was a conspiracy to transport stolen airplane parts. In that particular case, those airplane parts weren't part of this entirely regulated, very tightly knit thing. And I don't know what the indictment in Rue says, but with respect to the airplane parts, in that particular case, I think that the error, if there was an error of law, was the government used 18 U.S.C. 2311, which defined value for jurisdictional purposes at face, par, or market value. In this particular case, Judge Whitney, the trial judge, used, I think, discretion that he had in the individual facts of this case. There is no vision in the guideline for how to do this. I'm sorry. And I think where this leads you, then, is not, and correct me if I'm misstating what I understand to be how you would analyze it. It is not that there is necessarily, it's not necessarily that we have to find a distinction between a wholesale victim and a retail victim, but that the district court has the discretion to make such a determination on the basis of the facts of a particular case? Yes, Your Honor. Yes, Your Honor. I don't think that there's anywhere in the guidelines where it says retail versus hotel. It says market value. It's a factual matter based on the facts of a particular conspiracy. And we're always trying to transmute factual matters into de novo legal matters and bit by bit move the whole sentencing function up to the appellate level. This happens in case after case after case where factual matters are not recognized as such. Yes, Judge. We would agree with you. Was this argument about Philip Morris being the sole victim here under the facts of this conspiracy, as alleged, was this brought up in the brief? No, Your Honor. I think that even at the trial— It emerged full-blown in oral argument. Well, in fairness, it stems from the judge's sentencing. Yes, Your Honor. Yes, Your Honor. I think that the question is whether the sentence is procedurally reasonable. To determine if it's procedurally reasonable, there has to be a determination of whether or not Judge Whitney miscalculated the guideline. And in this particular case, I don't think it's a matter of law. It's a matter of fact. And he's entitled to some discretion in that area, in which every case and every stolen property case, even, or every stolen property commerce or conspiracy case, or certainly every conspiracy, stolen property, and money laundering case is going to have a different set of victims. It's not limited to one. I think that there are many, many victims along the way. But doesn't that—I don't disagree with you. I don't know that anyone would disagree with you that the district court is entitled to a certain amount of discretion here. But isn't it arguable that that discretion should proceed along informed or at least the analytical track that the sentencing guidelines call for, and that involves at the first step determining who the intended victim is? And the district court—all the district court did here, the standard that the district court applied is what's the greatest intended loss? He started, you might say, at the back end of the inquiry rather than the front end. Is that not troubling? Well, Your Honor, recalling that sentencing, what I remember and what I think the record will show is that Judge Whitney went to Section 2B1.1, looked at Comment Note 3, looked at the losses and the arguments that had been advanced by both sides, looked at the superseding indictment, which included the retailers involved, had sentenced one or two of the retailers, understood what the case was, and then applied that guideline. And the intended loss, I don't think that it was a matter of that there was just one victim. It was a matter of how do you ascertain what the victim is? Because it was an intended loss. It wasn't a matter of Lake and Rue where we could go to, say, a particular airplane manufacturer and say this is what it is. Right, but in deciding between wholesale and retail, he picked retail because it was greater. Well, yes, Your Honor, because it was the greater market value. That was the only point I was making. Yes, Your Honor. He didn't start. He said, okay, I have two numbers. One is high, one is low. I'll take the one that's high. Right. Not without determining in this context who was the intended victim, who was to be harmed here. Well, Your Honor, I would disagree with the extent that he didn't determine. I don't know if he explicitly went out and said this is the victim or this is not. He didn't. I mean, I don't think he did. And just if you would assume, because this is my question, that he didn't, which I think is correct. Yes, Your Honor. But I do think that there was certainly discussion about what the intended harms were because there was a lot of discussion on it throughout the trial. Yes. So in that respect, although there wasn't a specific victim identified, and also the guidelines, in particular, when you look at Section B of 2B.1.1b, it says right there in the caption, apply the greater of, and then it has a list. Did the district court make any findings about the victims that had losses? No, Your Honor. In fact, the court decided, at least for the purposes of restitution, that it was not a victim, that it was an intended loss. Did it identify any retailer as having an intended loss? No, Your Honor, it did not. But if the retailers were among the victims, it's your argument that the guidelines would give the district judge at least the discretion to provide that that was the intended loss or to choose the greater figure? Yes, Your Honor. He wouldn't have to. No. But factually, he would be permitted to. Certainly, on the facts of every individual case, market value is market value, and you have to determine what the market value is. But to determine the ultimate loss on the basis of market value, of the ultimate market value of the product, and if the retailers were among the victims, that can't be an illegitimate exercise of the district court's authority, can it? No, it certainly would not be an abuse of discretion. If the retailers were among the victims, and if choosing market value as a loss figure or the greater, if you use intended loss as the greater figure and you're entitled to take intended loss, and if retailers are among the victims, as I think they would be, choosing market value as an indicial of loss can't be . . . I mean, it doesn't seem to me to rise to an era of law or that it was beyond the district court's sentencing discretion because we've always given district courts, just as they have a certain discretion with respect to damages in a bench trial or that they have a certain discretion with attorney's fees, they also, it seems to me, in a guidelines calculation of this sort, would have just a certain bit of leeway in figuring this loss figure. All of these loss cases where we're talking about calculation of loss, there's no mathematically precise way or no precise blueprint to do them. They have to be tailored to the facts of the case. Yes, Your Honor, and in fact, the problem with wholesale loss in this case is that in addition to Philip Morris, the states of North and South Carolina would have derived significant revenue from that. The wholesale price, if it was taken off a truck in Virginia, the taxes would not have been applied. So the wholesale loss, if you were going to add wholesale as simply, it's not that simple in this particular context because certainly the excise taxes that would have been applied by the state of South Carolina would have been some $850,000 in addition or the taxes which would have been added on to the wholesale value. The victim, I gather you're arguing, could be the states too because they suffered a loss when it's stolen. Yes, Your Honor. But just getting back to the question that Judge Duncan asked, in conducting this analysis for loss, is it required to find who the victim of a crime is in order to establish the loss? Certainly the guidelines suggest the loss to the victim. Don't you have to find a victim? If you can. I understand if you can, but I'm now asking as sort of a legal approach. I'm not sure this is a case where the district court exercised discretion. I think this is a case where we're trying to figure out how to go through the guidelines and apply a loss calculation. I thought the guidelines suggested that you identify victims and measure the loss or intended loss to those victims. Certainly in a case where there's an actual loss, the court would be asked to find a victim. Well, a sting is a surrogate for an actual transaction, right? In a sting, I think the intended loss, where you don't have an actual loss, you have an intended loss. Where the intended loss is there, I think the court has to do at least find the harm that was caused. That might involve finding a victim, but if the court can't find a victim because it's an intended loss or because it's a wide scheme, then it could go to gain. So certainly the guidelines have a non-exhaustive list of our method in which a court should go and look at different things. Certainly there wasn't an actual loss here, so I don't know that the court illegally had to find a particular victim. It had to judge fairly... The Machado case and these other cases from the other circuits all have looked at the... When they've had a case like this on the wholesale market, they have calculated the loss based on Philip Morris's loss, not the retail. Well, I think in those particular cases... Yeah, in those particular cases, like, for instance, in Machado, they talked about how the different circuits were doing comparable offenses, but in that case the retail measure was the appropriate measure because the value would... The argument was it would, applying other sentences, require or provide disparate findings. And I think that it has to do with a case-by-case basis, I mean the individual facts of a case. If the guidelines thought that retail versus wholesale, the Sentencing Commission thought it was that simple a deal, they have provisions for product substitution, they have provisions for trademark infringements, for different types of things. The question at the end of the line has to be, did what this judge do run afoul of the guidelines? And it's hard. Did it transgress the guidelines? I'm hard-pressed to see that it did, but it's impossible... It's clear from what the district court did that he felt the retailers were victims, were among the class of victims. And that seems to me clear that he felt that because that's the only way he would have arrived at the ultimate calculation of loss was in understanding the retailers would be among the victims. Now, one could remand and say, well, let's find out who all the victims were, and we think the victims included Philip Morris and maybe the trucking company and maybe the wholesalers and maybe the retailers and maybe the state, and then let's, in turn, apportion the amount of loss to each of the four or five victims, and then we can come... That's a very difficult calculation. Well, actually, my recollection is that he said he didn't feel comfortable finding that retailers were victims. He went to sort of the end of the analysis and said he just picked the higher of the two numbers. And we do remand to ask, not because the district court necessarily got it wrong, but because we don't know how they arrived at what they concluded. And, Your Honor, I can't dispute... May I answer? I'm sorry. That's up to Judge Wilkinson. Yeah, please answer. Yes. My recollection is that, and the record, I think, will show, that there was a lot of discussion about this retail versus wholesale thing, and it was briefed ahead of time. To the extent that, Judge, I thought... I think the record reflects, and the pre-sentence report reflects, that it was a conspiracy that involved many factors and it had many victims, or many harms involved. I don't think that the judge identified a specific victim, but I think in an intended loss case, the guidelines don't necessarily require that. If there's other questions, I see my time is up. Certainly there were other issues, and I think they were well briefed. Thank you very much, Your Honor. Thank you. I'm going to try and make three quick points in rebuttal. First, I do think the Rue case is especially important in this situation because this court in Rue rejected the district court's application of retail value, didn't say the district court had discretion to pick retail value versus scrap value. So it is a reviewable proposition under circuit precedent. Secondly, I think the government's position that somehow the state taxes in this and the regulatory nature of cigarettes is a huge red herring that they're pulling across this court's path. It's not. I mean, if you're looking... If the idea is to measure the sentence by the value of the loss to the victim, the states were a victim, were they not? Except that at sentencing, the government conceded they weren't after anything of that. Okay, fair enough. But it's not a red herring. It may not have been presented or argued, but it seems to me if we're going to stick by the analysis. Now, the question I have is, was there any discussion suggesting that or argument suggesting that the retailers were victims that sustained loss? My recollection is there was discussion but no actual evidence showing that retailers lost any money in the case. The district court may have some discretion, but it doesn't have discretion to make up facts. Or perhaps if I may... Judge Niemeyer will accept a friendly amendment on this question. Is there anything in the record that suggests that the district court made a finding or took that into consideration, potential harm to the retail? My recollection is it's not. But my recollection could be wrong. But I don't think they did. And the third thing, I just want to address Judge Wilkinson's suggestion that somehow we've waived this argument. In our brief on page 45 and our reply brief on page 3, we talked about the loss being the manufacturer being the victim in the case. Now, I didn't say Philip Morris after manufacturer, but I think it was clear from our argument all along that we've argued the victim who operates on the wholesale market was the one who would have had the loss in this case if it hadn't been a sting. How do we identify an intended victim in a sting operation? I mean, I can see in many other instances where it would be important to identify a particular victim, but I'm sort of... It becomes a more difficult thing when you're dealing with a sting operation as opposed to identify a victim in a sting operation. I agree with you it's more difficult, but I think on these facts where the defendants were told we've stolen these cigarettes from the manufacturer's truck,  and it's the manufacturer. Thank you. Thank you. We will come down and greet counsel, and then we will take a brief recess and come back for our next case. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Allyson K. Duncan